USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 95-1674 UNITED STATES, Appellee, v. PHILIP GRANDMAISON, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Steven J. McAuliffe, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Keeton,* District Judge. ______________ ____________________ Martin G. Weinberg, with whom Oteri, Weinberg & Lawson, Cathy J. __________________ _________________________ _________ Green, and Kimberly Homan, Sheketoff & Homan, were on brief for _____ _______________ __________________ appellant. Peter E. Papps, First Assistant United States Attorney, with whom ______________ Paul M. Gagnon, United States Attorney, were on brief for appellee. ______________ ____________________ March 1, 1996 ____________________ ______________________ *Of the District of Massachusetts, sitting by designation. BOWNES, Senior Circuit Judge. On February 8, 1995, BOWNES, Senior Circuit Judge. ____________________ pursuant to a plea agreement with the government, defendant- appellant Philip Joseph Grandmaison ("Grandmaison") pled guilty to a one count information charging him with utilizing the mail system to defraud Nashua, New Hampshire, citizens of their right to the honest services of their public officials, in violation of 18 U.S.C. 1341, 1346. Grandmaison now appeals the eighteen-month sentence of imprisonment he received, contending that the district court failed to depart downward from the minimum prison term mandated by the Sentencing Guidelines ("Guidelines") because of the erroneous view that it lacked authority to do so. We agree that the district court misapprehended its authority to depart downward on aberrant behavior grounds. See Federal ___ Sentencing Guidelines Manual Ch. 1, Pt. A, Introduction  4(d) (1994). Accordingly, we vacate the sentence and remand to the district court for a determination of whether a downward departure on the basis of aberrant behavior is warranted in this case. Jurisdiction stems from 18 U.S.C.  3742. I. THE FACTS I. THE FACTS We consider the facts as set forth in the unobjected- to portions of the Presentence Investigation Report ("PSR"), the information to which defendant pled guilty, and the sentencing hearing transcript. See, e.g., ___ ____ -2- 2 United States v. LeBlanc, 24 F.3d 340, 342 (1st Cir.), cert. _________________________ _____ denied, -- U.S. --, 115 S. Ct. 250 (1994); United States v. ______ _________________ Brewster, 1 F.3d 51, 52 (1st Cir. 1993). Grandmaison served ________ as an "at-large" member on the Nashua Board of Alderman ("Board") from 1986 to 1993. The Board consists of fifteen members -- six of whom are elected at-large and nine of whom are elected from one of Nashua's nine electoral wards -- and functions as Nashua's chief legislative arm, enacting municipal legislation and approving all financing and municipal construction projects. Grandmaison served on the Board's Secondary School Coordinating Committee ("SSCC") and the Joint Special School Building Committee ("JSSBC"). Like many of his aldermanic colleagues, Grandmaison also had a full-time job. He was employed as Marketing Director of the Eckman Construction Company ("Eckman Construction"), a Bedford, New Hampshire-based company, from 1989 to 1993. In addition to his job as Eckman Construction's Marketing Director, Grandmaison participated in a number of charitable activities.  In 1990, the Board began seeking construction bids for a $6.3 million project, the renovation of Nashua's sixty- year old Elm Street Junior High School. Both the SSCC and the JSSBC, the two committees on which Grandmaison served, play integral roles in selecting a school construction contractor and in overseeing the construction process. The -3- 3 SSCC, inter alia, preselects school construction contractors, _____ ____ oversees school construction or renovation work, and makes recommendations concerning contractor expenditures and payments. The JSSBC, which is comprised of both alderman and Nashua School Board members, reviews the SSCC's recommendations regarding contractors, payments, and contract modifications. Eckman Construction submitted a bid for the lucrative Elm Street School Project contract. In spite of the conflict in interest, Grandmaison remained on both the SSCC and the JSSBC for months after Eckman Construction submitted its bid. He publicly recused himself from both committees on January 9, 1991, but only after questions were raised about his connections to Eckman Construction. The subcommittee vacancies created by Grandmaison's departures were filled by Alderman Thomas Magee ("Magee"), an at-large member of the Board and purported construction aficionado. After recusal from the SSCC and JSSBC, Grandmaison continued as an at-large member of the Board. He also secretly took steps to manipulate the contacts he enjoyed as an alderman to Eckman Construction's advantage. From February 1991 until shortly before the Elm Street Project was completed, Grandmaison lobbied three of his aldermanic colleagues -- Magee, Steve Kuchinski ("Kuchinski"), and Anne Ackerman ("Ackerman"), SSCC chairperson -- on Eckman -4- 4 Construction's behalf. Grandmaison distributed informational materials and video cassettes about Eckman construction to both Ackerman and Magee. At the behest of Hal Eckman ("Eckman"), president of Eckman Construction, Grandmaison gave gratuities, gifts, and other things of value to Kuchinski, Magee, and Ackerman before and after major contract selection votes. These gratuities and gift items included pay-per-view sporting events, dinners, money, campaign contributions, and promises of future political support. Grandmaison also extended Ackerman a personal loan and steered Eckman Construction printing jobs to the printing business she owned. These lobbying efforts eventually bore fruit. In June 1991, the Board awarded the Elm Street Project contract to Eckman Construction by a vote of eight to seven, with Kuchinski casting the tie-breaking vote. The project contract, which the Board subsequently mailed to Eckman Construction, served as the basis for the charges brought against Grandmaison. The government charged Grandmaison with violating 18 U.S.C. 1341, 1346, the mail fraud statute. Specifically, it maintained that Grandmaison utilized the mail system to forward a fraudulent scheme in violation of the oath of honest, faithful, and impartial service he took before becoming an alderman and a host of state and local laws pertaining, inter alia, to conflicts of interest, _____ ____ -5- 5 influencing discretionary decisions by public servants, and acceptance of pecuniary benefits by public officials. See ___ New Hampshire Revised Statutes Annotated 640 et seq. (1986 & __ ____ Supp. 1994); Nashua, N.H., Rev. Ordinances 2-273, 2-274, 2-276, 2-278; and Nashua, N.H., Rev. Ordinances 7:56, 7:59. The government also prosecuted Magee and Kuchinski for their roles in this case. Pursuant to a plea agreement with the government, Grandmaison pled guilty to a one count information charging him with utilizing the mail system to defraud Nashua citizens of their right to the honest services of their public officials. The district court scheduled a sentencing hearing and prior thereto received a PSR from the Probation Department. The PSR prepared by the Probation Department recommended a total adjusted guideline offense level of fifteen. This recommendation reflects an eight level increase in the base offense because a public official in a decision making position committed the crime and a three level decrease for acceptance of responsibility. See ___ U.S.S.G. 2C1.7(b)(1)(B), 3E1.1 (a) and (b). Because Grandmaison had no prior criminal record, the Probation Department placed him in Criminal History Category I, resulting in a sentencing range of eighteen to twenty-four months. II. THE SENTENCING HEARING II. THE SENTENCING HEARING -6- 6 At the sentencing hearing, Grandmaison requested a downward departure to an offense level of eight, which corresponds to a sentencing range of zero to six months. Grandmaison based this request on three interrelated grounds: 1) his criminal conduct constituted "aberrant behavior" within the meaning of Guidelines Manual Ch. 1, Pt. A, Introduction  4(d); 2) his extraordinary contributions to family, friends, and the community were not adequately addressed by the Guidelines; and 3) the facts of his case warranted a downward departure by analogy to section 2C1.3 of the Guidelines. The defense also submitted one hundred letters attesting to Grandmaison's good deeds and character at the sentencing hearing. Based on these letters and Grandmaison's prior record, the government agreed that downward departure on aberrant behavior grounds was appropriate and recommended a reduced prison sentence of twelve months and one day. The district court declined to depart downward on any of the three grounds advanced by Grandmaison. The court, citing our decision in United States v. Catucci, 55 F.3d 15, ________________________ 19 n.3 (1st Cir. 1995), as support, found that a "downward departure based on 'aberrant behavior,'" though generally available under the Guidelines, "was not available as a matter of law" in this case. It concluded that Grandmaison's conduct did not fall within the definition of aberrant -7- 7 behavior. The definition adopted by the court required a showing of first-offender status, behavior inconsistent with otherwise good or exemplary character, and spontaneity or thoughtlessness in committing the crime of conviction.  Next, the court concluded that the facts did not warrant downward departure on the basis of Grandmaison's contribution to family, friends, and the community. It did not make a specific finding on the section 2C1.3 claim raised by Grandmaison, but did state that "no other grounds . . . advanced [by defendant or the government]. . . would justify departure downward." Accordingly, the court adopted the PSR's factual findings and offense calculations in full. Honoring the government's request for leniency, the court selected the lowest end of the applicable guideline range and sentenced Grandmaison to an eighteen month term of imprisonment and two years of supervised release. The court also assessed Grandmaison $50.00, as required by statute.  III. REFUSALS TO DEPART FROM THE GUIDELINES III. REFUSALS TO DEPART FROM THE GUIDELINES Before addressing the three grounds on which defendant rests his appeal, we briefly discuss the rules pertaining to refusals to depart from sentences prescribed by the Guidelines. Under the Sentencing Reform Act, sentencing courts are expected to apply the Guidelines, adjust the base offense level as the facts require, calculate a sentencing range, and impose a sentence within the identified range. -8- 8 United States v. Jackson, 30 F.3d 199, 201 (1st Cir. 1994); ________________________ see 18 U.S.C. 3553(b); Guidelines Manual Ch. 1, Pt. A, ___ Introduction 4(b). In general, sentencing courts are to regard "each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct each guideline describes." Guidelines Manual Ch. 1, Pt. A, Introduction comment 4(b). Departures are warranted only where a case is atypical or where the facts are significantly outside the norm. Jackson, 30 F.3d at 201.  _______ Decisions to depart generally fall into one of three categories: forbidden, discouraged, and encouraged. Forbidden departures are those based, inter alia, on race, _____ ____ sex, national origin, creed, religion, or socioeconomic status. See Jackson, 30 F.3d at 202; United States v. ___ _______ __________________ Rivera, 994 F.2d 942, 948-49 (1st Cir. 1993); U.S.S.G.  ______ 5H1.10, 5H1.12. The Sentencing Commission ("Commission") has expressly precluded departure on these grounds, even where they make a case atypical or extraordinary. Rivera, 994 F.2d ______ at 948-49. Discouraged departures involve factors which were considered by the Commission -- such as age, family ties and responsibilities, employment record, good works, or physical condition -- but which present themselves to an extraordinary degree in a particular case. United States v. DeMasi, 40 ________________________ F.3d 1306, 1323-24 (1st Cir. 1994), cert. denied, -- U.S. --, _____ ______ 115 S. Ct. 947 (1995); United States v. Hilton, 946 F.2d 955, _______________________ -9- 9 959 (1st Cir. 1991). Encouraged departures, in contrast, involve considerations not previously taken into account by the Commission. Hilton, 946 F.2d at 959.  ______ Because the Commission intended departures on any grounds to be the exception rather than the rule, Jackson, _______ 30 F.3d at 201, a district court's refusal to depart -- upward or downward -- is ordinarily not appealable. See ___ United States v. DeCosta, 37 F.3d 5, 8 (1st Cir. 1994); __________________________ United States v. Gaines, 7 F.3d 101, 105 (7th Cir. 1993); ________________________ Hilton, 946 F.2d at 957. The well-established rule is that ______ appellate courts lack jurisdiction to review discretionary district court decisions not to depart from sentences imposed under the Guidelines. See United States v. Byrd, 53 F.3d ___ ______________________ 144, 145 (6th Cir. 1995); United States v. Gifford, 17 F.3d ________________________ 462, 473 (1st Cir. 1994); United States v. Amparo, 961 F.2d _______________________ 288, 292 (1st Cir.), cert. denied, 506 U.S. 878 (1992).  _____ ______ There are, however, certain exceptions to this rule. Appellate jurisdiction attaches, for example, where the record indicates that the trial court's failure to depart was the product of a mistake of law. Gifford, 17 F.3d at _______ 473; Amparo, 961 F.2d at 292; Hilton, 946 F.2d at 957. If it ______ ______ appears that a misapprehension of the applicable guideline or miscalculation of the authority to deviate from the guideline range prevented the court from departing downward, appellate review is appropriate. Gifford, 17 F.3d at 473; United _______ ______ -10- 10 States v. Pierro, 32 F.3d 611, 619 (1st Cir. 1994), cert. ________________ _____ denied, -- U.S. --, 115 S. Ct. 919 (1995).  ______ Our review as to whether such a misapprehension of judicial authority occurred is plenary. United States v. _________________ Ovalle-M rquez, 36 F.3d 212, 221 (1st Cir. 1994), cert. ______________ _____ denied, -- U.S. --, 115 S. Ct. 1322 (1995). Plenary review ______ also governs where the issue on appeal pertains to the scope or interpretation of a guideline. United States v. Marcello, _________________________ 13 F.3d 752, 755 (3d Cir. 1994)("The question of whether the district court adopted the proper standard [of interpretation] is a question of law subject to plenary review.").  IV. DISCUSSION IV. DISCUSSION The crux of Grandmaison's appeal is that the district court misunderstood the scope of its departure authority. He argues that the court erroneously concluded that it was precluded from departing downward on the grounds of aberrant behavior and extraordinary offender characteristics. Additionally, he maintains that the court misapprehended its power to depart downward by analogy to section 2C1.3 of the Guidelines, which concerns conflicts of interest. See U.S.S.G. 2C1.3. We begin by analyzing the ___ claim that the facts of this case permit downward departure on the basis of aberrant behavior and discuss the two remaining bases for appeal in turn. -11- 11 A. Aberrant Behavior as a Basis for Downward A. Aberrant Behavior as a Basis for Downward Departure. Departure 1. Jurisdiction and the District Court's 1. Jurisdiction and the District Court's Refusal to Depart. Refusal to Depart. The threshold issue raised by defendant's aberrant behavior claim is whether we have jurisdiction to review the district court's refusal to depart downward. Pierro, 32 F.3d ______ at 619. We note at the outset, though it does not relate directly to questions of jurisdiction, that the basic premise of defendant's aberrant departure claim is correct. The Guidelines permit downward departures on the basis of aberrant behavior. See, e.g., Catucci, 55 F.3d at 19 n.3 ___ ____ _______ (citing cases); Marcello, 13 F.3d at 760 (citing cases); ________ Gifford, 17 F.3d at 475; United States v. Morales, 972 F.2d _______ ________________________ 1007, 1011 (9th Cir. 1992), cert. denied, -- U.S. --, 113 S. _____ ______ Ct. 1665 (1993). Such departures fall into the category embracing factors not previously considered by the Commission. United States v. Premachandra, 32 F.3d 346, 349 _____________________________ (8th Cir. 1994); United States v. Fairless, 975 F.2d 664, __________________________ 668-69 (9th Cir. 1992); see Guidelines Manual Ch. 1, Pt. A, ___ Introduction 4(d)("The Commission, of course, has not dealt with the single acts of aberrant behavior that still may justify probation at higher offense levels through departures."). And they may be employed whether the sentence computed involves imprisonment or merely probation. See ___ -12- 12 United States v. Duerson, 25 F.3d 376, 380 (6th Cir. ___________________________ 1994)(citing cases); Fairless, 975 F.2d at 668. ________ Consistent with the departure recommendation it entered at sentencing, the government acknowledges that aberrant behavior departures are available under the Guidelines, but maintains that we lack jurisdiction to review defendant's claim because the district court's refusal to depart was an exercise of discretion. Defendant disputes this, arguing that he has cleared his jurisdictional hurdle because the record clearly shows that the district court's refusal to depart stemmed from a misapprehension of its authority to depart on aberrant behavior grounds. See ___ Gifford, 17 F.3d at 473; Pierro, 32 F.3d at 611. Having _______ ______ reviewed the totality of the record, as we are obligated to do, see United States v. Morrison, 46 F.3d 127, 130 (1st Cir. ___ _________________________ 1995)(citing United States v. LeBlanc, 24 F.3d 340, 348 (1st _________________________ Cir.), cert. denied, -- U.S. --, 115 S. Ct. 250 (1994)), we _____ ______ find that the truth lies somewhere between these two positions. The record reveals that the district court understood its general authority to depart on aberrant behavior grounds, but adopted the wrong standard in determining whether defendant's behavior was "aberrant" under the Guidelines. The court erroneously held that an aberrant behavior departure in this Circuit requires an initial -13- 13 finding of "spontaneity" or a "thoughtless act." Anticipating our review, the court also made it clear that it would have granted the departure requests entered by both defendant and the government had it not believed itself bound to this standard: THE COURT: And so I'm going to sentence you at the lowest end of the guidelines range that otherwise is applicable in your case. If the Court of Appeals disagrees with my interpretation of aberrant behavior and the case is returned, if it helps the Court of Appeals in terms of imposing sentence on appeal or resolving the question on appeal, assuming you do appeal, I will say on the record that if I thought I could depart on a principled basis and consistent with the law, I would follow the U.S. Attorney's recommendation and I would sentence you to one year -- 12 months and one day. Based on this statement, we think it plain that the court misunderstood its authority to depart downward under the law of this Circuit. We therefore agree with defendant on this initial matter of jurisdiction. The district court's misapprehension of its departure authority confers jurisdiction on this court. See Gifford, 17 F.3d at 473; Pierro, 32 F.3d at 619. ___ _______ ______ The de novo standard of review governs our review of this __ ____ aspect of defendant's claim. See Marcello, 13 F.3d at 755.  ___ ________ 2. A Definition of Aberrant Behavior. 2. A Definition of Aberrant Behavior. -14- 14 The Guidelines refer to "single acts of aberrant behavior," but neither define that phrase nor provide any insight into what the Commission might have meant when it used it. See Guidelines Manual Ch. 1, Pt. A, Introduction  ___ 4(d); United States v. Williams, 974 F.2d 25, 26 (5th Cir. _________________________ 1992), cert. denied, 507 U.S. 934 (1993). Defendant's claim _____ ______ presents an issue of first impression in this Circuit. We have considered cases involving departure requests based on aberrant behavior, see, e.g., Catucci, 55 F.3d at 19 n.3; ___ ____ _______ United States v. Pozzy, 902 F.2d 133, 137-38 (1st Cir.), ________________________ cert. denied, 498 U.S. 943 (1990); United States v. Russell, _____ ______ ________________________ 870 F.2d 18, 21 (1st Cir. 1989), but have not had occasion to define that term with specificity until now. Catucci, supra, _______ _____ which the district court erroneously regarded as foreclosing departure, did not require us to define "aberrant behavior." In that case, we acknowledged disagreement among the circuits as to what type of conduct aberrant behavior entails but did not deem it necessary to articulate a definition for our own Circuit because we found that the defendant had waived his departure claim. Grandmaison's claim, in contrast, hinges on an articulation of an aberrant behavior standard. We, therefore, turn our attention to that task.  Two cases establish what have come to be recognized as the outer boundaries of the aberrant behavior spectrum. United States v. Russell, 870 F.2d 18 (1st Cir. 1989), stands ________________________ -15- 15 at one end of the spectrum and United States v. Carey, 895 _______________________ F.2d 318 (7th Cir. 1990), at the other. Russell involved _______ criminal conduct which was impulsive and unpremeditated. Tempted by the prospect of instant wealth, a Wells Fargo armored truck driver and his partner decided to keep an extra bag of money mistakenly handed them. The driver, who had no prior criminal record, returned the money almost immediately after committing his crime and cooperated in the subsequent police investigation. In contrast, Carey involved a _____ premeditated criminal scheme carried out over a long period of time. There, a trucking company president engaged in a check-kiting scheme over a fifteen-month period. Each work day during this period the company president concealed his two over-drawn bank accounts by having his bookkeeper prepare checks to cover the fund shortage. He signed each check and frequently deposited them himself. The Seventh Circuit held that this behavior was not "aberrant." 895 F.2d at 324-25. Uncertainty about the reason for the district court's refusal to depart precluded this court from deciding that issue in Russell.  _______ Circuit courts are divided over where criminal conduct must fall on the aberrant behavior spectrum to justify downward departure. As we noted in Catucci, some _______ have adopted an expansive view of what aberrant behavior means in the context of the Guidelines, whereas others -16- 16 require a spontaneous or thoughtless act of the sort committed by the defendant in Russell. The Seventh Circuit's _______ decision in Carey provided the moorings for the latter group _____ of circuits. The Carey court held that "[a] single act of _____ aberrant behavior . . . generally contemplates a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning because an act which occurs suddenly and is not the result of a continued reflective process is one for which the defendant may be arguably less accountable." 895 F.2d at 325. The Seventh Circuit later reinforced this tight interpretation in United States v. _________________ Andruska, 964 F.2d 640, 645-46 (7th Cir. 1992), a decision ________ reversing a district court's decision to depart downward in a case involving a woman found guilty of concealing her fugitive paramour from arrest.  The Third, Fourth, Fifth, and Eighth Circuits have embraced the Seventh Circuit's view of aberrant behavior. For example, in Marcello, supra, the Third Circuit explained ________ _____ that "there must be some element of abnormal or exceptional behavior" before adopting the Seventh Circuit's spontaneity requirement and reversing the district court's decision to depart downward. 13 F.3d at 761. The Marcello defendant was ________ an attorney who, on seven separate occasions, structured bank deposits to avoid tax reporting requirements in violation of -17- 17 31 U.S.C. 5322(a), 5324(3). He committed these offenses over the span of seven consecutive working days.  Cases involving extensive planning or repeated criminal acts received similar treatment in the Fourth, Fifth, and Eighth Circuits. In United States v. Glick, 946 _______________________ F.2d 335, 338 (4th Cir. 1991), the Fourth Circuit reversed a downward departure decision after noting that the defendant transported letters containing stolen trade secrets across state lines on several occasions. In Williams, supra, the ________ _____ Fifth Circuit affirmed a district court's refusal to depart downward because the robbery executed by the defendant involved planning. Similarly, the Eighth Circuit found that a bank fraud scheme carried out over a one year period lacked the level of spontaneity and thoughtlessness required by cases such as Carey. See United States v. Garlich, 951 F.2d _____ ___ ________________________ 161, 164 (8th Cir. 1991); see also Premachandra, 32 F.3d at ___ ____ ____________ 349.  In contrast, the Ninth and Tenth Circuits have eschewed any focus on spontaneity and thoughtlessness, opting instead for a broad view of aberrant behavior. They require reviewing courts to employ the totality of the circumstances test in making aberrant behavior determinations. Under this test, courts consider a variety of mitigating factors, such as pecuniary gain to the defendant, prior good deeds, and an effort to mitigate the effects of the crime in evaluating -18- 18 whether a defendant's conduct was unusual or, more specifically, "aberrant." See, e.g., United States v. Takai, ___ ____ ______________________ 941 F.2d 738, 741 (9th Cir. 1991).  In Takai, the Ninth Circuit affirmed the district _____ court's decision to depart downward after finding that the defendants who pled guilty to bribery of and conspiracy to bribe an Immigration and Naturalization Service official, inter alia, received no pecuniary gain, had no criminal _____ ____ record, and had been influenced by a government agent. A convergence of factors, such as the defendant's manic depression, suicidal tendencies, and recent unemployment, also led the Ninth Circuit to affirm downward departure in Fairless, supra, an armed robbery case. Similarly, in United ________ _____ ______ States v. Pena, 930 F.2d 1486, 1494 (10th Cir. 1991), a drug ______________ possession case, the Tenth Circuit held that downward departure was appropriate because the defendant's behavior was an aberration from her usual conduct, which was highlighted by long-term employment, no abuse or prior distribution of controlled substances, and economic support of her family.  We are persuaded, after reviewing the cases decided by our colleagues in other circuits, that the approach taken by the Ninth and Tenth Circuits achieves the balance between uniformity in sentencing and district court discretion the Guidelines were intended to strike. See Jackson, 30 F.3d at ___ _______ -19- 19 201-02. We, thus, hold that determinations about whether an offense constitutes a single act of aberrant behavior should be made by reviewing the totality of the circumstances. District court judges may consider, inter alia, factors such _____ ____ as pecuniary gain to the defendant, charitable activities, prior good deeds, and efforts to mitigate the effects of the crime in deciding whether a defendant's conduct is aberrant in terms of other crimes. See DeMasi, 40 F.3d at 1324 ___ ______ (departure determination should be made by comparing case to other cases involving the stated reason for departure). Spontaneity and thoughtlessness may also be among the factors considered, though they are not prerequisites for departure. That aberrant behavior departures are available to first offenders whose course of criminal conduct involves more than one criminal act is implicit in our holding. See ___ Takai, 941 F.2d at 743. We think the Commission intended the _____ word "single" to refer to the crime committed and not to the various acts involved. As a result, we read the Guidelines' reference to "single acts of aberrant behavior" to include multiple acts leading up to the commission of a crime. See ___ id. Any other reading would produce an absurd result. ___ District courts would be reduced to counting the number of acts involved in the commission of a crime to determine whether departure is warranted. Moreover, the practical effect of such an interpretation would be to make aberrant -20- 20 behavior departures virtually unavailable to most defendants because almost every crime involves a series of criminal acts. Even the Russell defendant, whose spontaneous actions _______ are widely regarded as a classic example of aberrant behavior, could be understood to have committed more than a single act of aberrant behavior. He conspired with his partner to take money from the armored truck he drove; took the money; and then kept the money for a short period of time. Thus, we think that focusing on the crime of conviction instead of the criminal acts committed in carrying out that crimebest comports with what theCommission intended. The approach we now adopt does not unnecessarily expand opportunities for departure under the Guidelines. The totality of the circumstances test, though admittedly broader than the spontaneity test employed in Carey, is consistent _____ with the Commission's intention to limit applications of the aberrant behavior principle. See Andruska, 964 F.2d at 645. ___ ________ Concerns that it ensures every first offender a downward departure from their Guidelines-imposed sentence are without foundation. As the Ninth Circuit explained in United States _____________ v. Dickey, 924 F.2d 836 (9th Cir. 1991), "aberrant behavior _________ and first offense are not synonymous." 924 F.2d at 838; see ___ Glick, 946 F.2d at 338. Without more, first-offender status _____ is not enough to warrant downward departure.  -21- 21 District courts are not, however, precluded from considering first-offender status as a factor in the departure calculus. Departure-phase consideration of a defendant's criminal record does not, we think, wrongly duplicate the calculations involved in establishing a defendant's criminal history category under the Guidelines. First, as we just noted, it is obviously not the case that every defendant in Criminal History Category I will be qualified for an aberrant behavior departure. There will be individuals in that category who, for instance, are not entitled to departure because they were convicted of several unrelated offenses or who have been regular participants in elaborate criminal enterprises. See Morales, 972 F.2d at ___ _______ 1011. Second, to the extent that considering a defendant's criminal record at both the criminal history and departure stages amounts to double counting, the Guidelines clearly permit it. But see Marcello, 13 F.3d at 755 (3d Cir.) ___ ___ ________ (concluding that the Guidelines prohibit considering a defendant's criminal record at both the criminal history and departure stages). The Guidelines explain that "the court may depart . . . even though the reason for departure is taken into consideration . . . if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate." U.S.S.G. 5K2.0.  -22- 22 The question now becomes whether defendant's conduct falls within the ambit of aberrant behavior under the standard we have articulated. We leave this to the district court's discretion. It occupies the best vantage point from which to make the decision. Rivera, 994 F.2d at 950. We, ______ therefore, vacate defendant's sentence and remand for resentencing.  B. Extraordinary Offender Characteristics as a B. Extraordinary Offender Characteristics as a Basis for Downward Departure. Basis for Downward Departure. Defendant's second argument on appeal is that the district court misunderstood its authority to depart on the ground of his extraordinary characteristics. We agree that extraordinary characteristics such as unusual family obligations or exceptional charitable activities may, in certain circumstances, provide a basis for a downward departure. See, e.g., United States v. Haverstat, 22 F.3d ___ ____ ___________________________ 790, 795-96 (8th Cir. 1994), cert. denied, -- U.S. --, 116 S. _____ ______ Ct. 671 (1995); United States v. Canoy, 38 F.3d 893, 905-07 _______________________ (7th Cir. 1994); Rivera, 994 F.2d at 948-53; United States v. ______ ________________ Sclamo, 997 F.2d 970, 973-74 (1st Cir. 1993); Pena, 930 F.2d ______ ____ at 1495; United States v. Big Crow, 898 F.2d 1326, 1332 (8th _________________________ Cir. 1990). We disagree, however, that the district court misunderstood its authority to depart. It appears clear that the court found that defendant's family obligations and charitable activities, though noteworthy, were neither extraordinary nor exceptional. -23- 23 The best indicator of the district court's unwillingness to depart downward on the basis of extraordinary characteristics is the stark difference between the court's sentencing-hearing statements about departure on this basis and on the grounds of aberrant behavior. When asked to make a finding about defendant's extraordinary offender characteristics claim, the district court stated: THE COURT: To the extent you've asked me to depart based on that, I would find that those, extraordinary commitment to family and extraordinary offender characteristics, don't rise to the level that would justify a departure out of the heartland of the guidelines . . . So to the extent I have discretion in that regard, I exercise my discretion not to depart downward. These statements make it plain that the district court's refusal to depart stemmed from an exercise of discretion. See DeCosta, 37 F.3d at 8 ("[we suggest] . . .[t]hat the ___ _______ district court say . . . that it has considered the mitigating factors urged but does not find them sufficiently unusual to warrant a departure in the case at hand."). And even if we were to assume that these statements are ambiguous, that ambiguity, without more, would not be enough to make the district court's refusal to depart appealable. Morrison, 46 F.3d at 132; see United States v. Romero, 32 ________ ___ ________________________ F.3d 641, 654 (1st Cir. 1994). Our review of this matter is, thus, at an end. We lack jurisdiction to review the district -24- 24 court's refusal to depart downward on the basis of extraordinary offender characteristics. Byrd, 53 F.3d at ____ 145; Gifford, 17 F.3d at 473. _______ C. The Heartland of Section 2C1.7 of the C. The Heartland of Section 2C1.7 of the Guidelines. Guidelines. Defendant's final argument on appeal concerns the scope of section 2C1.7 of the Guidelines, which corresponds to 18 U.S.C. 1341, 1346, the mail fraud statute to which he pled guilty. Without disputing section 2C1.7's general applicability to his conduct, defendant maintains that the district court misapprehended its authority to impose a shorter prison term by departing downward, by analogy, to the sentence prescribed under section 2C1.3 of the Guidelines. For individuals in Criminal History Category I, section 2C1.3 -- which concerns conflicts of interest by present and former federal officers and employees -- carries a sentencing range of zero to six months. Section 2C1.7 imposes a sentencing range of eighteen to twenty-four months for individuals in the same category. See U.S.S.G. 2C1.7 (Fraud Involving ___ Deprivation of the Intangible Right to the Honest Services of Public Officials); U.S.S.G. 2C1.3 (Conflict of Interest).  Though cast as a claim relating to the district court's refusal to depart, defendant's argument, at its core, primarily concerns the heartland of section 2C1.7 of the Guidelines. Defendant essentially argues that his conduct falls outside the heartland of section 2C1.7 and within the -25- 25 scope of section 2C1.3 because it primarily involved a conflict of interest, not fraud. Because questions concerning the scope and meaning of a guideline, unlike questions pertaining to the facts which lead a district court to render its departure decision, are quintessentially legal in nature, see LeBlanc, 24 F.3d at 345, Rivera, 994 F.2d at ___ _______ ______ 952, we have jurisdiction to review defendant's claim. Our review is plenary, as it is whenever a district court's decision "reflect[s] a determination of the purpose of, or an interpretation of the language in, a guideline or statute." LeBlanc, 24 F.3d at 344; see United States v. Rosales, 19 _______ ___ _________________________ F.3d 763, 769 (1st Cir. 1994). To determine whether defendant's conduct is of the sort which generally falls within section 2C1.7's "heartland," we must determine the nature of the underlying crime of mail fraud. See, e.g., LeBlanc, 24 F.3d at 346. We ___ ____ _______ look in part to the language of the mail fraud statute and to the legislative history which accompanies it. Id. In ___ relevant part, section 1341 provides: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, [uses the mail system or causes it to be used] shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall -26- 26 be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. Congress enacted this statute in 1872, as "a general proscription against using the mails to initiate correspondence in furtherance of 'any scheme or artifice to defraud.'" McNally v. United States, 483 U.S. 350, 355, 359 ________________________ (1987). The legislative history suggests that Congress intended the mail fraud statute to protect people from "schemes to deprive them of their money or property." Id. at ___ 356. Before 1987, section 1341 was read as a broad shield, protecting individuals against schemes to deprive them of intangible, as well as tangible, property. Then, in 1987, the Supreme Court held that the statute did not embrace intangible rights. McNally held that the mail fraud statute _______ does not prohibit schemes to defraud individuals of their intangible rights to the honest services of government. 483 U.S. at 359-60; see Carpenter v. United States, 489 U.S. 19, ___ __________________________ 25 (1987). In 1988, Congress enacted section 1346, the honest services amendment, to reverse the Supreme Court's decision in McNally. United States v. Bucuvalas, 970 F.2d 937, 942 _______ ___________________________ n.9 (1st Cir. 1992); United States v. Alkins, 925 F.2d 541, _______________________ 548 (2d Cir. 1991); McEvoy Travel Bureau, Inc. v. Heritage ________________________________________ Travel, Inc., 904 F.2d 786, 790 (1st Cir. 1990); see 134 _____________ ___ Cong. Rec. S17360-02 (daily ed. November 10, 1988)(Judiciary -27- 27 Committee analysis)("This section overturns the decision in McNally v. United States . . . Under [this] amendment, [the ________________________ mail and wire fraud] statutes will protect . . . the right of the public to the honest services of public officials."). Section 1346 became effective on November 18, 1988 and provides: For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services. See Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, Title ___ VII, 7603 (a), 102 Stat. 4508 (1988). It restores mail fraud convictions to their pre-McNally status by allowing the _______ government to predicate mail fraud prosecutions on deprivations of the intangible right of honest services. United States v. Bryan, 58 F.3d 933, 940 n. 1 (4th Cir. _______________________ 1995); Waymer, 55 F.3d at 568 n.3; see 135 Cong. Rec. S1063 ______ ___ (daily ed. February 2, 1989)(statement of Sen. Biden). An offense under section 1346 is established when the evidence demonstrates that the use of the mail system played a role in executing the deprivation of the honest services of government. Schmuck v. United States, 489 U.S. 705, 710 __________________________ (1989)(citing Kann v. United States, 323 U.S. 88, 95 (1944)); _____________________ see United States v. Yefsky, 994 F.2d 885, 890, 892 (1st Cir. ___ _______________________ -28- 28 1993); United States v. Dray, 901 F.2d 1132, 1137 (1st Cir. ______________________ 1990), cert. denied, 498 U.S. 895 (1990).  _____ ______ Section 1346 includes cases in which the mail system plays an integral role in the scheme to defraud citizenry of the honest services of government, as well as schemes in which use of the mail system is only incidental to the larger plan. Id. at 710-11; see United States v. Morrow, ___ ___ _______________________ 39 F.3d 1228, 1236-37 (1st Cir. 1994), cert. denied, 115 S. _____ ______ Ct. 1421 (1995) (mail fraud generally includes incidental use of the mails in furtherance of a scheme to defraud). The Eleventh Circuit recently affirmed a defendant's conviction on twenty-two counts of mail fraud even though the defendant only used the mail system to receive payments from his partner in a money laundering the scheme. In Waymer, supra, ______ _____ the court rejected claims that section 1346 is vague and overbroad and reiterated the Supreme Court's conclusion in Schmuck, supra, that "[i]t is sufficient for the mailing to _______ _____ be 'incident to an essential part of the scheme' or 'a step in the plot.'" 55 F.3d at 569; see also Badders v. United ___ ____ _________________ States, 240 U.S. 391, 393-94 (1916). In Waymer, the ______ ______ defendant was an elected member of the Atlanta Board of Education who failed to fully disclose his relationship with the contractor who provided pest control services to Atlanta's public schools. Unbeknownst to the other school board members, the defendant received fifteen percent of all -29- 29 the proceeds from the contractor's contracts with the school system.  Courts have read section 1346 to include efforts by public officials and employees to conceal their fraudulent acts from the public "by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct." See McEvoy Travel, 904 F.2d at 791. For example, ___ _____________ the Fourth Circuit recently upheld the conviction of a public official on such grounds in United States v. Bryan, 58 F.3d ______________________ 933 (4th Cir. 1995). In that case, the Director of the West Virginia Lottery orchestrated a scheme whereby he secretly ensured that lottery contracts and contract bids were awarded to companies with whom he had a personal relationship. The Fourth Circuit held that section 1346 applied to the defendant's conduct. 58 F.3d at 939-41. Similarly, United ______ States v. Alkins, 925 F.2d 541 (2d Cir. 1991), a Second __________________ Circuit case, upheld the section 1346-based convictions of six Department of Motor Vehicles employees because they failed to disclose their fraudulent activities to department officials. 925 F.2d at 549. The defendants in that case secretly processed improperly documented applications for driver's licenses, identification cards, and vehicle registrations in return for monetary disbursements.  We hold that the conduct to which Grandmaison pled guilty falls within the range of conduct Congress intended 18 -30- 30 U.S.C. 1341, 1346 to encompass and, concomitantly, rests squarely within the heartland of section 2C1.7. Grandmaison continued to lobby Board members on behalf of Eckman Construction after his recusal from the SSCC and JSSBC. He secretly delivered gratuities to Magee, Ackerman, and Kuchinski to secure favorable votes on Eckman Construction's bid. He distributed informational materials about Eckman Construction to Magee and Ackerman without disclosing his actions to other Board members. And he caused the Elm Street Project contract to be sent to Eckman Construction via the mail system. Though there is no evidence that Grandmaison received direct monetary benefit from his actions, there can be little doubt that under cases such as Waymer, Bryan, and ______ _____ Alkins he deprived the citizens of Nashua of the honest ______ services of their government under section 1346. This is not an unusual case. Defendant maintains that he is mainly guilty of not revealing a conflict of interest. To be sure, his conduct involved some element of such a violation. It does not follow from this, however, that he should not be sentenced pursuant to section 2C1.7, the guideline corresponding to the mail fraud  -31- 31 statute to which he pled guilty. First, we are convinced that 18 U.S.C. 1341, 1346 encompasses crimes of the sort committed by defendant. Second, even if the applicability of section 1346 were suspect, we are not at all certain that downward departure to the sentence prescribed by section 2C1.3 would be appropriate. This is principally because section 2C1.3 linguistically does not apply to defendant or his conduct; that guideline only addresses conflicts of interests by present or former federal officers and employees and, therefore, does not reach state or local officials such as defendant. In the final analysis, defendant has managed to persuade us of only one thing: that had he been a federal employee or official, the government might have been able to charge him with violating other statutes as well. See ___ U.S.S.G. 2C1.3 (listing statutory provisions corresponding to that guideline). Because this argument clearly does not merit the application of a lower sentencing range defendant seeks, we affirm the district court's refusal to depart downward by analogy to section 2C1.3.  V. CONCLUSION V. CONCLUSION For the foregoing reasons, we vacate Grandmaison's sentence and remand for resentencing under the aberrant behavior standard formulated in this opinion. Defendant's appeal for downward departure on the basis of his extraordinary offender characteristics is dismissed for lack -32- 32 of jurisdiction. And we affirm the district court's refusal to depart downward by analogy to section 2C1.3 of the Guidelines. It is so ordered.  It is so ordered.  ________________ -33- 33