UNITED STATES of America

v.

Roger LANGILLE,

No. CRIM.No.03–79–B–W.

United States District Court,
D. Maine.

April 7, 2004.

Brett D. Baber, Law Office of Brett D. Baber, Bangor, ME, for Roger Langille (1), Defendants.

James L. Burke, U.S. Attorney's Office, Bangor, ME, for USA, Plaintiff.

### ORDER GRANTING DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE FOR ABERRANT BEHAVIOR UNDER U.S.S.G. § 5K2.20

WOODCOCK, District Judge.

On October 22, 2003, Roger Langille, a seventy year old man living in his car, having just been denied a bank loan, marched undisguised back into the same bank, handed the teller a note threatening to shoot her, and left with just over $3,000. Within moments, he was apprehended, cash still in hand, at an auto mechanic's shop while he waited for a new car battery to be installed in his get-away vehicle. Before the turn of the year, Mr. Langille had pleaded guilty to bank robbery. This case comes for sentencing before this Court. Over the objection of the Government, this Court grants the Defendant a downward departure for aberrant behavior under U.S.S.G. § 5K2.20. The Defendant is in a Criminal History Category I with no prior criminal record. His total offense level is 21; the guideline range is thirty-seven to forty-six months imprisonment. This Court sentences the Defendant to twenty months imprisonment and three years of supervised release with standard and specific conditions.

### I. Statement of Facts.

Roger Langille, now a seventy-one year old man, is unmarried and has no children. He is a veteran, having served in the United States Army in 1950–51. While in the Army, he sustained leg and internal injuries. Mr. Langille last worked in 2001 as a part-time security guard. Approximately four years ago, the Veterans Administration determined it had overpaid Mr. Langille approximately $20,000 in veteran's benefits. To recoup its overpayment, the VA stopped payment of his $200 monthly veteran's benefit. Despite repeated efforts to obtain employment since 2001, Mr. Langille had been unsuccessful and he found himself unable to make ends meet on his net monthly social security benefit. By October 23, 2003, his situation had become desperate and he was living in his car. On that day, he entered the Machias Savings Bank in Calais, Maine to obtain a loan. The bank officers noted the outstanding debt to the Veterans Administration and denied his loan request. Mr. Langille left the Bank.

Shortly thereafter, Mr. Langille returned to the same bank, proceeded to the teller's window, and passed a note to the teller, which stated the following: "This is a bank robbery—have gun in my jacket. Put money in bag or I'll shoot you." The teller immediately handed Mr. Langille $3,574 in cash, and he left the bank. Mr. Langille did not, in fact, have a gun. He drove away and went directly to an auto repair shop, where he was in the process of having a new car battery installed in his automobile when he was apprehended by the Calais police. Mr. Langille had not spent any of the stolen money; the Machias Police Department has returned the full $3,574 to Machias Savings Bank.

### II. Discussion.

**A. Did the Defendant's Threatening Note Constitute "Otherwise Use" of A Dangerous Weapon Under Section 5K2.20(c)(2), Preventing Downward Departure?**

As a preliminary matter, the Court considers whether it has the discretion to

grant a downward departure under § 5K2.20(c)(2) in view of Mr. Langille's written threat to shoot the teller. Section 5K2.20(c)(2) provides as follows:

The court may not depart downward pursuant to this policy statement if any of the following circumstances are present: (2) The defendant discharged a firearm *or otherwise used* a dangerous weapon." (emphasis supplied).

The Application Notes state that the terms, "dangerous weapon," "firearm," or "otherwise used" must be given the meanings in the Commentary to § 1B1.1 (Application Instructions).

Turning to the Commentary to § 1B1.1, the following definitions appear:

(G) "Firearm" means (i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (ii) the frame or receiver of any such weapon; (iii) any firearm muffler or silencer; or (iv) any destructive device.

. . .

(D) "Dangerous weapon" means (i) an instrument capable of inflicting death or serious bodily injury; or (ii) an object that is not an instrument capable of inflicting death or serious bodily injury but (I) closely resembles such an instrument; or (II) the defendant used the object in a manner that created the impression that the object was such an instrument (*e.g.* a defendant wrapped a hand in a towel during a bank robbery to create the appearance of a gun).

U.S.S.G. § 1B1.1; Application. Mr. Langille did not "discharge a firearm" within the meaning of § 5K2.20(c)(2); he never possessed a firearm to discharge. However, the definition of "dangerous weapon" is sufficiently broad to raise concerns as to whether his threatening note was the legal equivalent to wrapping his hand in a towel. If so, simply by passing a note threatening the use of a firearm, he may have legally used a "dangerous weapon," even though he did not physically possess one. Fortunately, the Court is not required under its analysis to decide in the abstract what would otherwise be a conundrum: whether a man can use a weapon he did not possess.

The Court ultimately concludes even if the note were a "dangerous weapon" within the meaning of § 5K2.20(c)(2), Mr. Langille had not "otherwise used" it within the meaning of the Guidelines. Under § 1B1.1(I), the Court is required to apply the following definition to "otherwise used":

(I) "Otherwise used" with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.

The Guidelines define "brandished" in (C) as follows:

(C) "Brandished" with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

Under this set of definitions, since the "otherwise use" of the "dangerous weapon" has to be less than its discharge but

more than its brandishing, the defendant's conduct would have to fit within an extremely narrow band. For example, if a defendant pointed a gun at a teller, but did not shoot, this would be more than brandishing, but less than discharging and the "otherwise used" definition would apply.[1]

There is little caselaw on this issue. *United States v. May*, 359 F.3d 683, 691–92 (4th Cir.2004); *United States v. Williams*, 71 Fed.Appx. 197, 199 (4th Cir. 2003) (determining aberrant behavior downward departure was unavailable, because defendant pointed gun at teller).

This Court concludes that under § 1B1.1(I), Mr. Langille could not brandish, display or possess a weapon he did not have, much less do something "more" than brandish, display or possess it. Under this series of definitions, Mr. Langille did not "otherwise use" a dangerous weapon and, therefore, the Court concludes the Guidelines do not prohibit a downward departure for aberrant behavior.

1. Meshing these provisions requires the Court to engage in an analysis so subtle, it becomes illusive. The premise of § 1B1.1(D)'s definition of "dangerous weapon" to include a hand wrapped in a towel appears to be that the crime should be viewed from its likely impact on the victim. The teller does not know whether the towel contains a hand or a handgun. However, to "otherwise use" the dangerous weapon, § 1B1.1(I) requires the Defendant do something *more than* brandish, display or possess the firearm. The § 1B1.1(C) definition of brandish requires that "all or part of the weapon" be displayed or the "presence of the weapon" be otherwise "made known to another person." The section goes on to state that "the weapon, must be present."

Sections 1B1.1(C) and (I) of the Guidelines seem directed to the Defendant's conduct, not its impact on the victim. In the real world, the average teller would be convinced the robber was using the gun to commit the robbery, when he brandished it, but the Guidelines mandate *more than* brandishing before it

## B. Did The Defendant Meet The Remaining Requirements of Section 5K2.20 For Downward Departure For Aberrant Behavior?

Under U.S.S.G. § 5K2.20, a downward departure may be warranted for aberrant behavior only "in an exceptional case." The Guideline sets forth the specific requirements:

(1) The Defendant may have committed only a "single criminal occurrence or single criminal transaction";

(3) The crime must have been of "limited duration";

(4) The crime must represent a "marked deviation by the defendant from an otherwise law-abiding life."

U.S.S.G. § 5K2.20(b). In addition, the Application Notes provide further factors for analysis:

3. *Other Circumstances to Consider.*— In determining whether the court should depart under this policy statement, the court may consider the defendant's (A) mental and emotional conditions; (B)

is considered "otherwise used." A bank robber could, therefore, threaten the teller and show he means business by pulling the weapon out of his pocket, but he would not be deemed to have "otherwise used" the gun unless he did something more with it, presumably point it right at her. There must be a good reason the Guidelines make these distinctions, but at least in the context of whether the Court should have the authority to downward depart for aberrant behavior, the Court is at a loss as to what it is.

Returning briefly to the hand in the towel example, the "more than brandishing" provision seems to require the bank robber take his hand out of the towel and point his finger at the teller in order to meet the definition of "otherwise used." By doing so, of course, he would not be using a dangerous weapon. One wonders why, at least in the context of aberrant behavior, the Guidelines go to such pains expressly to include hand in towel-like conduct in the definition of "dangerous weapon" only effectively exclude such conduct in the definition of "otherwise used."

employment record; (C) record or prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense.

U.S.S.G. § 5K2.20(b), app. n. 3.

    (2) The crime must have been committed "without significant planning";

■ Finally, this Court has reviewed case law for guidance on the proper application of § 5K2.20. The seminal First Circuit case on aberrant behavior was decided before § 5K2.20 went into effect. *United States v. Grandmaison*, 77 F.3d 555 (1st Cir.1996); *see also United States v. Dewire*, 271 F.3d 333, 335 n. 2 (1st Cir.2001) (noting § 5K2.20 became effective November 1, 2000). In *Grandmaison*, the First Circuit ruled that in determining whether to depart downward for aberrant behavior, the courts should look at the "totality of the circumstances." *Id.* at 563. The *Grandmaison* Court directed the sentencing courts to consider such mitigating factors as pecuniary gain to the defendant, prior good deeds, efforts to mitigate the effects of the crime, and the spontaneity and thoughtlessness of the crime.

This Court applies the Guidelines Requirements, the Application Notes, and the *Grandmaison* case to the facts in this case.

### C. Guideline Requirements: § 5K2.20(b).

■ Mr. Langille has met all of the guideline requirements set forth in § 5K2.20(b). This was a single criminal occurrence or single criminal transaction with limited duration. Mr. Langille committed the crime without significant planning. After being denied the loan, he came back shortly and, apart from writing out the threatening note, there is no indication he had planned the crime. He made no effort to disguise or mask his face; to the contrary, he decided to rob the same bank where he had just been and

where he had just divulged all his identifying information. He had no firearm or dangerous weapon. He had no apparent plan of escape. Instead of heading out of town, he proceeded to an auto repair business where he waited for mechanics to install a new battery in his car. He was picked up by the police still within the confines of the small city of Calais within moments following the crime, having neither spent nor stashed the money.

The crime was also a marked deviation from an otherwise law-abiding life. Mr. Langille had managed to spend nearly seventy years on this earth without committing a crime. There is no evidence of any prior involvement with the criminal justice system: no felonies; no misdemeanors; no charges.

### D. Application Note Considerations

The Court next analyzes the considerations of Application Note 2. There was little direct evidence of Mr. Langille's mental or emotional condition before or at the time of the crime, except the PreSentence Report, which stated Mr. Langille had felt "depressed" prior to his arrest due to his financial problems and homelessness. Mr. Langille's employment record substantiated he had worked for various employers up to the year 2002 and had not worked since that time. Mr. Langille's prior good works consisted primarily of his service to his country in the United States Army and the injuries he had sustained during that service. Mr. Langille's motivation for committing the offense was to obtain money for his own use. This factor weighed against him, but was placed in the context of his desperate financial straights.

### E. *Grandmaison* Considerations.

This Court has addressed the spontaneity/ thoughtlessness, pecuniary gain, and prior good deeds factors. There is admit-

tedly no indication of Mr. Langille's engaging in charitable activities; living in a car at the time of the robbery, Mr. Langille was, in this Court's view, a proper object of charity. The final *Grandmaison* factor is Mr. Langille's efforts to mitigate the effects of his crime. The only evidence on this issue is that the full amount of the stolen money was promptly recovered and returned to the bank.

### III. Conclusion.

Based on the record before it and over the objection of the Government, this Court concludes Mr. Langille presented a truly "exceptional case" under § 5K2.20, which justifies a downward departure from the guideline range of sentence of thirty-seven to forty-six months. Mr. Langille's crime is so amateurish, spontaneous, and ill-conceived, and such a marked deviation from his prior life that it has all the characteristics of the foolish and thoughtless act of a man pushed over the brink. The Court concludes that when the Sentencing Commission drafted § 5K2.20 allowing a downward departure for aberrant behavior, it had someone like Roger Langille and his crime in mind.

Mr. Langille's conduct was by no means blameless. He did, after all, rob a bank and threaten to shoot the teller. The fact the teller immediately handed more than $3,000 over to Mr. Langille is evidence she took the threat seriously. This Court concludes a sentence of twenty months in prison followed by three years of supervised release would best balance the congressional sentencing directives set forth in 18 U.S.C. § 3553(a), tailoring as best this Court can the punishment to fit the crime and its perpetrator.

SO ORDERED.