UNITED STATES of America,

v.

**Frank Anthony IACONETTI,**
**Defendant.**

**No. 1:98CR10089–NG.**

United States District Court,
D. Massachusetts.

July 7, 1999.

Michael D. Ricciuti, Robert L. Peabody, U.S. Attorney's Office, Boston, MA, for U.S.

Roger A. Cox, Ashland, MA, Ivan E. Mercado, Jamaica Plan, MA, for Juan Carlos Pena–Roa, defendant.

John C. Doherty, Andover, MA, Benjamin D. Entine, Boston, MA, for John Jairo Pena–Pineda, aka, Primo, defendant.

James H. Budreau, Oteri Weinberg & Lawson, Boston, MA, Joseph S. Oteri, Boston, MA, for Frank Anthony Iaconetti, defendant.

### SENTENCING MEMORANDUM

GERTNER, District Judge.

This memorandum concerns the sentencing of Frank Anthony Iaconetti ("Iaconetti"). Iaconetti has pled guilty to the charge of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. The plea agreement stipulated to a certain quantity of drugs, namely between 50 kilograms and 150 kilograms of cocaine. Both sides reserved their rights to argue the appropriateness of a departure based on "single acts of aberrant behavior." U.S.S.G. Ch. 1, Pt. A, intro comment 4(d).

The presentence report raised additional concerns not addressed by the plea agreement, namely: (1) the quantity of drugs for which Iaconetti may be held responsible at sentencing; (2) Iaconetti's mental status, noting that he apparently suffered from a compulsive gambling disorder; and (3) whether Iaconetti can be supervised in Canada, where he resides, after his release from prison.

I directed the government to produce additional information on the subject of the quantity of drugs. I directed Probation to clarify the question of whether post-imprisonment supervision may be conducted in Canada, and I directed Iaconetti to explore and provide materials on the nature of his compulsive gambling disorder.

After holding hearings over two days, reviewing the memoranda, letters from family and friends, additional information requested from doctors and supervisors, I have concluded that a departure is appropriate. Accordingly, I sentenced Iaconetti to 15 months on Count I, with credit for time served. Given the length of Iaconet-

ti's pretrial detention, the net effect of the sentence is release on supervised release. As a condition of supervised release, Iaconetti was to participate in a gambling abuse program, among other conditions, supervised by authorities in Quebec, Canada.

## I. FRAMEWORK

In order to apply the Guidelines to the case at bar, (i.e., to interpret facts and law with respect to the quantity of drugs under U.S.S.G. § 2D1.1), the Court is obliged to look carefully at the facts that the Guidelines have made relevant, chiefly facts pertaining to the offense. But in order to determine the appropriateness of a Guideline sentence in this case (i.e., whether to depart from the Guidelines) the Court is obliged to conduct a broader review, not merely facts made relevant by the Guidelines, but all relevant sentencing facts.[1]

I will begin by outlining the general facts with respect to Iaconetti and this offense, and then address specific guideline and departure issues.

## II. FACTS

### A. Background

Frank Iaconetti is a 31 year old Canadian citizen whose immediate family, extended family and over forty friends, appeared in court for both days of the sentencing, in many cases traveling from Canada to do so. Iaconetti has been consistently employed in the car business. He has no criminal record whatsoever.

The latter fact is more significant than appears at first glance. Iaconetti has had a gambling compulsion for over ten years, which resulted in his falling deeper and deeper into debt. But notwithstanding the financial pressures the gambling engendered—and they were considerable—he was law abiding. He struggled to meet the demands of his compulsion through lawful means—his own income, the resources of family. Finally, the amounts were too high. In over his head, Iaconetti succumbed to a "loanshark" who offered him a quick way out.

At first, Iaconetti's gambling involved traveling to Atlantic City once or twice a year. Then the frequency of the trips

1. Recognizing the limitations of a Guideline approach to all of the vagaries of a sentencing decision, departures were explicitly authorized by the Sentencing Reform Act if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). As the Supreme Court noted in *Koon v. United States*, while the Guidelines provide uniformity, predictability and detachment, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensure." 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). The Supreme Court in *Koon* directed the district court to "make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing." *Id.* at 98, 116 S.Ct. 2035.

Plainly, in order to make a departure determination, the Court must have a perspective independent of the Guidelines—all the facts the case involves, and not just those facts made relevant by the Guidelines. Thus, 18 U.S.C. § 3553(a)(1) directs that the Court, "in determining the particular sentence to be imposed, shall consider—(1) the nature and circumstances of the offense and the history and characteristics of the defendant." Likewise, 18 U.S.C. § 3661, which was codified along with the Sentencing Reform Act, encourages a broader review. It states: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. And the Commission itself directed that, when considering a departure from a Guidelines prescribed sentence, "the court may consider, without limitation, any information concerning the background, character, and conduct of the defendant." U.S.S.G. § 1B1.4. *See United States v. Ribot*, 1999 WL 165919, * 1 n. 2 (D.Mass.1999).

increased. When a casino opened near his home in Montreal, he began to gamble regularly. By this time the defendant was winning or losing from $5,000 to $10,000 per day.

By 1993, his debts had accumulated to $42,000, and he was unable to meet them. He asked his parents for assistance and, although of limited means, they agreed. Iaconetti stopped gambling for almost a year, but without seeking treatment. In short order, he resumed. In 1996, in an extraordinary move, he asked to be banned from the Montreal casino and they did so. Again, he failed to control his compulsion; he snuck in to the casino to continue gambling until he was discovered.

Finally, Iaconetti fell into an even deeper hole. He owed his parents and older brother $20,000, and an onsite loanshark at the casino $30,000. He had no means of his own to repay the debt; his business was failing because of his gambling. His parents' resources had been depleted. The loanshark made him an offer that he apparently could not refuse: Take this money to Boston and the debt will be wiped out. It seemed simple. He seized the opportunity and violated the law for the first time in his life. He was immediately apprehended.

### B.  *Offense: Question of Quantity*

The presentence report covers the offense in ten pages. Iaconetti is mentioned only in two. There is no doubt whatsoever that he had no role in shaping the offense, negotiating for it, or implementing it. And even after he arrived on the scene of the offense, there are serious questions concerning what he understood its scope was—whether he knew that he had come to Boston from Montreal, Canada, with $250,000 in cash to pick up 100 kilograms of cocaine from local drug suppliers, and not some different amount.

Because this was a plea, the information with respect to quantity was sketchy. Accordingly, I urged the parties to provide additional facts. The following details are gleaned from the presentence report, as modified by the government's submission to me.

The negotiations for drugs in this case began on January 23, 1998, when the cooperating witness, "CW," received a message on his electronic pager from Montreal, Canada. Thereafter negotiations continued between the CW, the putative cocaine supplier, and individuals from Montreal, a woman named La Monita (a/k/a Cecilia Pena–Roa), Juan Carlos Pena–Roa, her son, and Juan Jairo Pena Pineda, the putative buyers. The amount was to be 100 kilograms of cocaine. At the outset, the price was to be between $17,000 and $18,000 per kilogram. The CW was to receive a deposit, with the balance to be paid later. Further negotiations took place in Massachusetts with Juan Carlos or Juan Jairo. From time to time, La Monita called directly. The negotiations dragged on until March, 1998.

During these protracted negotiations, Iaconetti's name is not mentioned; nor is he referred to even indirectly. Given the amount of information that the government has, this omission is telling: They have reports from the CW, as well as multiple consensually monitored telephone calls. It is clear that Iaconetti was solely the courier, brought in at the eleventh hour to deliver the deposit.

On March 15, 1998, the undercover agents met the CW and Juan Jairo in the parking lot of a hotel, at which point the CW received $250,000 in cash. But there was a snag. FBI agents posing as cocaine suppliers spoke with La Monita on a cell phone about delaying delivery of the cocaine. While these arrangements were negotiated, other agents had what appears to be casual conversation with Iaconetti. The presentence report, describing this conversation, suggests that Iaconetti confirmed that he brought the case to pay for "the drugs." When the agents indicated that because of problems with the warehouse, the drugs could not be delivered until

Monday, Iaconetti reported that he was on a tight schedule. He was to collect the cocaine, drive it to Albany, New York, and arrive at a fixed time so he could deliver it to a trucker traveling north to Canada. Nothing in that conversation, however, at least in the version reported in the presentence report, suggested whether Iaconetti understood that the money he was carrying was only the down payment for a much larger quantity of drugs or represented the entire payment. If it were the latter, then there was no basis for holding Iaconetti responsible for 100 kilograms.

In response to this Court's inquiry, the government provided the following additional information: The government represented to the Court that an undercover agent told Iaconetti that the money that Iaconetti brought from Canada was part of the payment for the 100 "things" that Iaconetti had come to get. Iaconetti responded, "Yeah, I understand that." No witness testified to this effect, or put the conversation in context.

The government pointed to a discussion about the size of the containers which Iaconetti was using to receive the drugs to suggest that Iaconetti knew he would be carrying a very large quantity. When the undercover agent suggested using large hockey (equipment) bags to store the drugs, Iaconetti stated that he wanted the drugs packed in suitcases since he was traveling by car. Moreover, he stated that he would prefer that three rather than four suitcases be used for the drugs because four suitcases would take up too much room in his car. The inferences the government would draw from this colloquy are simply too attenuated, especially where a man's liberty is involved.

### III.  *GUIDELINE CALCULATIONS*

*Base Offense Level:*

The government maintains that the base offense level under U.S.S.G. § 2D1.1 is between 50 kilograms and less than 150 kilograms for a score of 36.

If the defendant is held responsible only for the amount suggested by the money he was carrying, i.e. the amount of drugs suggested by $150,000 at $16,500 per kilogram, the quantity is slightly over 15 kilograms and the base offense level is 34.

*Specific Offense Characteristics:*

Under U.S.S.G. § 2D1.1(b)(6) if the defendant meets the criteria set forth in (1)–(5) of U.S.S.G. § 5C1.2 and the offense level is 26 or greater, a decrease of two levels is required. All agree that this reduction is warranted.

### Minus 2

*Role in the Offense:*

Under U.S.S.G. § 3B1.2(a) the defendant is granted a 4 level reduction for his minimal role.

### Minus 4

*Acceptance of Responsibility:*

### Minus 3

The total offense level is 27 (according to the government) or 25 (if a lesser quantity is found).

### IV.  *QUANTITY OF DRUGS*

█ The base offense level is determined by the quantity of drugs for which the defendant is held responsible on sentencing. It is a pivotal issue. It is to be determined by the acts of the defendant himself, under U.S.S.G. § 1B1.3(a)(1)(A) and, "in the case of a jointly undertaken criminal activity ... all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken activity ..." U.S.S.G. § 1B1.3(a)(1)(B).

Since Iaconetti was not only a novice at drugs in general and he was completely peripheral to this operation, I cannot infer that he knew its real scope, absent some factual data—what others said to him, what admissions he made, what was reasonable for him to conclude under the

circumstances. He was carrying $250,000. While it may be reasonable for him to conclude that that amount would cover an amount over 15 kilograms (assuming a purchase price of between $16,500 up to $18,000), it was not reasonable for him to believe—based only on the money—that it was to be a down payment for 100 kilograms. The data that the government offers in addition—the agents' account of a conversation about "100 things," which was offered not through an affidavit or even an FBI 302, but in a letter from the government, together with the size of the containers Iaconetti had with him, are not sufficient to establish by a fair preponderance of the evidence that he understood the full scope of the operation.

Accordingly, I will hold Iaconetti responsible only for between 15 kilograms and 50 kilograms of cocaine, for a level 34.

### V. ABERRANT CONDUCT/GAMBLING

The Sentencing Commission recognized the limitations of a rigid approach to the Guidelines. It acknowledged that there was a "vast range of human conduct potentially relevant to a sentencing decision," U.S.S.G. Ch. 1, Pt. A. intro comment 4(b), and as such, no single set of Guidelines could accommodate every case. Likewise, the Commission recognized the importance of judicial departures, even in a Guideline system, as the means by which the Guidelines would be refined, and the system would evolve. *Id.* Indeed, the Commission specifically acknowledged one area, "single acts of 'aberrant behavior,' which may still justify probation at higher offense levels through departures." U.S.S.G. Ch. 1, Pt. A, intro. comment 4(d).

■ The First Circuit's definition of aberrant behavior, which it adopted from the Ninth and Tenth Circuits, and which has since been followed by the Second Circuit, seeks to examine the "totality of the circumstances" in deciding whether to grant a departure for aberrant behavior. *See United States v. Grandmaison,* 77 F.3d 555, 563 (1st Cir.1996); *Zecevic v. United States Parole Commission,* 163 F.3d 731, 733 (2nd Cir.1998); *United States v. Jones,* 158 F.3d 492, 500 (10th Cir.1998); *United States v. Pena,* 930 F.2d 1486, 1495 (10th Cir.1991); *United States v. Takai,* 941 F.2d 738, 741 (9th Cir.1991). Factors that may be considered in making this determination include "pecuniary gain to the defendant, charitable activities, prior good deed, and efforts to mitigate the effects of the crime[.]" *Grandmaison,* 77 F.3d at 563. "Spontaneity and thoughtlessness may also be among the factors considered, though they are not prerequisites for departure." *Id.* Such departures are available even though a "course of criminal conduct involves more than one criminal act[.]" *Id.* Finally, I am to evaluate all the data in order to determine whether this offense is a "marked departure from the past and is unlikely to recur." *United States v. Bradstreet,* 135 F.3d 46, 56 (1st Cir.1998).[2]

■ The objective data from Iaconetti's life suggests that this offense *is* a "marked departure." This is a young man, an automobile salesman who was a good worker, a loyal friend, son, and relative. He has had no other encounters with law enforcement. While first-offender status, standing alone, is insufficient to justify a departure, it may be considered as part of the mix of factors. *See Grandmaison,* 77 F.3d at 564.

2. In fact, there are two perspectives from which to judge whether particular conduct by an offender is "aberrant." One compares the offense and offender with other offenders who have committed the same offense. This approach is a different formulation of the "heartland" concept. *See e.g., United States v. Delvalle,* 967 F.Supp. 781, 784 (E.D.N.Y. 1997). Alternatively, one can compare the offense, and the conduct it entailed, with the rest of the offender's life. This approach focuses entirely on the offender's life—his or her character, record in the community, and all the factors considered by the *Grandmaison* court in the "totality of circumstances." *See* 77 F.3d at 563. The latter is the appropriate approach in this case.

In order to evaluate the "likely to recur" issue, I may look at the defendant's motivation and the presence or absence of "any psychological disorders that the defendant was suffering from, whether the defendant was operating under extreme pressures." *United States v. Colace*, 126 F.3d 1229, 1231 n. 2 (9th Cir. 1997). Iaconetti's gambling compulsion is plainly relevant here. Indeed, the overall picture suggests something like an opportunistic crime,[3] brought on by gambling debts to a loanshark and the loanshark's not so bright idea as to how to extinguish them: Deliver the money and your debt is reduced. Whether this gambling compulsion stands on its own or as a basis for a departure under U.S.S.G. § 5K2.13,[4] it is

3. In those circuits that have rejected the First Circuit's "totality of the evidence approach" the focus is on the offense itself, whether it involves "a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning." *United States v. Carey*, 895 F.2d 318, 325 (7th Cir.1990). *United States v. Russell*, 870 F.2d 18 (1st Cir.1989) was the paradigm. In *Russell*, the defendant was a Wells Fargo armored truck driver and his partner was the truck's messenger. A bank mistakenly gave the pair an extra bag of money containing $80,000, which both men, yielding to temptation, decided to keep for themselves. A week later, however, Russell confessed the crime, returned the money that he had kept, and cooperated with authorities. 870 F.2d at 19.

I do not suggest that Iaconetti's offense totally fits the "spontaneous" and "thoughtless act" test. As noted above, it does not have to do so in order to qualify for the First Circuit's definition of aberrant behavior. Nevertheless, it does appear that this offense was opportunistic in the sense that Iaconetti did not seek out a drug deal to satisfy his obligations to the loanshark, or seek out other illegal activities. The opportunity was presented to him, and in a moment of extraordinarily bad judgment, he accepted it.

4. The Commission promulgated U.S.S.G. § 5H1.3, a policy statement, not a Guideline, indicating that "mental and emotional conditions are not *ordinarily* relevant in determining whether a sentence should be outside the guideline range." *See* U.S.S.G. § 5H1.3 (emphasis added). The only other reference to mental condition is in U.S.S.G. § 5K2.13, another policy statement, which provides that for defendants who have committed non violent offenses, "while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public." Broader than U.S.S.G. § 5H1.3, U.S.S.G. § 5K2.13 explicitly "encourages" a departure for a mental condition that reduces the mental capacity of a non violent offender.

For a claim of diminished capacity, attributable to compulsive gambling, to succeed, the defendant must show: 1) that he suffered from a pathological gambling disorder which 2) resulted in a significantly reduced mental capacity 3) causally connected to the commission of the charged offenses. *See U.S. v. Harris*, 1994 WL 683429, *1 (S.D.N.Y.), *aff'd*, 79 F.3d 223 (2nd Cir.1996). The record in this case, the reports of Dr. Dodes, and the presentence report, suggest that the defendant has met this test. The First Circuit has not decided whether compulsive gambling may rise to the level of diminished capacity as a question of law. *See United States v. Harotunian*, 920 F.2d 1040 (1st Cir.1990).

To be sure, other courts have dismissed compulsive gambling because it is "only" an "impulse control disorder," as distinguished from disorders affecting the ability to reason. *See Venezia v. United States*, 884 F.Supp. 919, 925 (D.N.J.1995). The case law, however, suggests that a diminished capacity departure is not limited to a defendant who is unable to reason, or process information in the usual way. It includes a defendant who is unable to control his conduct, even if his cognitive abilities are unimpaired. *See United States v. McBroom*, 124 F.3d 533, 548 (3rd Cir.1997) (concluded that there is a two prong approach to defining "reduced mental capacity" under U.S.S.G. § 5K2.13—includes a person who is unable to absorb information in the usual way *or* the person who knows what he is doing and that it is wrong, but cannot control his behavior or conform it to the law) (emphasis added); *United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir.1993) ("reduced mental capacity" refers not only to a lack of full intellectual functioning, but also emotional conditions as well, including mood disorders); *United States v. Poff*, 926 F.2d 588, 595 (7th Cir.) *cert. denied*, 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991) (Easterbrook, J., dissenting) ("We have treated U.S.S.G. § 5K2.13 as applying to emotional conditions as well [as lack of full intellectual functioning]

plainly an important part of an aberrant conduct analysis.

Dr. Lance Dodes[5] provided this Court with a diagnosis of Iaconetti as suffering from pathological (compulsive) gambling based on the presence of at least eight of the ten criteria defined by the Diagnostic and Statistical Manual of the American Psychiatric Association. In addition, Dr. Dodes puts the disorder in context: While illegal acts are characteristic of pathological gambling, he reports, Iaconetti's case presents a different pattern. He strove to pay the debts—first from his personal resources, then the business, and finally his family.[6] He reports that "Mr. Iaconetti's conscience would have inhibited him from performing illegal actions, or even seeking them out. It was not until the combination of his desperation arising from his compulsive gambling was coupled with *the unexpected opportunity to reduce his debt that he committed the present crime* —an action that is out of keeping with both his character and his previous behavior." (Italics supplied).[7]

Letters from family and friends reflect their shock at the defendant's actions. The presentence report confirms no prior criminal activity, no drug involvement

... Treating emotional illness in the same way that we do mental abnormalities furthers the purpose of U.S.S.G. § 5K2.13. The role of the guideline is lenity toward defendants whose *ability to make reasoned decisions is* impaired. Emotional conditions, like mental impairments may distort or suppress the formation of reasoned decisions.").

Nor am I persuaded that compulsive gambling disorder is excluded because it may be analogized to drug or alcohol dependence, which the Guidelines make clear "is not a reason for imposing a sentence below the guidelines." *See* U.S.S.G. § 5H1.4; *United States v. Harotunian*, 920 F.2d 1040, 1047 (1st Cir.1990); *United States v. Katzenstein*, 1991 WL 24386 (S.D.N.Y.). In some instances the Guidelines are explicit; in others the language is more general, less "code like." If I find *it to be relevant under these circum*stances because it explains otherwise uncharacteristic behavior, because it appeared so severe as to compromise the defendant's ability to control his behavior, then nothing in the

whatsoever. A departure on the ground that this offense comprised aberrant behavior in an otherwise exemplary life is appropriate.

## VI. CONCLUSION

I will depart from a level 25 to a level 14. Given the amount of time that Iaconetti has served, that departure will permit his immediate release to address the profound problems he faces. The "aberrant" behavior standard permits departures to permit a sentence of probation for qualifying defendants. Iaconetti has already served time. He has been in prison since March 15, 1998, serving 15 months far from his home in Canada. A departure to level 14, and a sentence of 15 months, permits him to return to Canada and, as a condition of supervised release, to participate in therapy for his gambling addiction. Authorities in Canada have agreed to supervise the defendant upon his release from prison.

## SO ORDERED.

Guidelines forecloses my consideration under U.S.S.G. § 5K2.13.

5. Dr. Dodes is the Director, Center for Problem Gambling at the Mount Auburn Hospital, Cambridge, Massachusetts, Assistant Clinical Professor of Psychiatry, Harvard Medical School.

6. After his parents loaned him money in 1993, Iaconetti asked to have his name removed from a deed of a jointly owned property because he felt uncomfortable, in the light of his debts to his family.

7. I did not depart on this basis in *United States v. Buchanan*, 987 F.Supp. 56, 57 (D.Mass.1997). Buchanan involved a bank president who believed throughout the trial that he was entirely correct in diverting bank money to his family and his personal use. Far from aberrational, the illegal activities stemmed from his view of his entitlements as the 99.9% shareholder of the bank.