**UNITED STATES of America,**

v.

**Flor JURADO–LOPEZ, Defendant.**

**Crim. No. 03–10102–NG.**

United States District Court,
D. Massachusetts.

Oct. 6, 2004.

Michael C. Bourbeau, Bourbeau and Bonilla, Boston, MA, for Flor Jurado–Lopez (2), Defendant.

Denise J. Casper, Dickens Mathieu, Kevin McGrath, William D. Weinreb, United States Attorney's Office, Boston, MA, for USA, Plaintiff.

### *SENTENCING MEMORANDUM*

GERTNER, District Judge.

Before boarding a plane bound for Boston, Flor Jurado–Lopez ("Jurado–Lopez"),

a 29–year–old Guatemalan woman, was locked in a room and forced to insert heroin pellets inside her, under the threat that, otherwise, the men guarding her would do the inserting against her will. This episode took place against a backdrop of extortion, and the shootings of her parents and her husband in Guatemala.

By inserting twenty-three pellets of heroin into her rectum, Jurado–Lopez gravely endangered herself and a pregnancy (a pregnancy at the time unknown to her). Her crime was being a drug "mule"—in effect acting as a human container for drugs, as well as carrying them in the false linings of her luggage. She was arrested on March 11, 2003, along with a second "mule," Yolanda Garcia–DeFlores.

While detained pre-trial, Jurado–Lopez gave birth to Alexa Yailin Lau–Jurado. Alexa was her first child after an eight year marriage and years of fertility treatments. Alexa was taken from her at three days old and placed into the custody of a family friend, Walda Sosa, and her husband, Elmo Jimenez.

The government called for a sentence of 70 months, rejecting all mitigating adjustments urged by the defense and probation.

Jurado–Lopez, they argued, should serve 57 more months (she had already spent 13 months in pre-trial detention) in prison, apart from her newborn and her husband, and then be deported back to Guatemala.

The defendant—and, significantly, probation—argued for a lower sentence based on: a) the defendant's minimal role in the offense (role adjustment under U.S.S.G. § 3B1.2), b) the serious threats of physical harm that drove her to be a mule (coercion and duress under U.S.S.G. § 5K2.12), c) the impact of separation on her child (extraordinary family circumstances under U.S.S.G. § 5H1.6), and d) her cooperation with the government (extraordinary acceptance of responsibility under U.S.S.G. § 3E1.1).

On December 9, 2003, the defendant pleaded guilty to count one of the indictment, charging a conspiracy to import heroin in violation of 21 U.S.C. §§ 952(a) and 960(a), as well as count two, charging the importation of heroin on March 11, 2003, in violation of 21 U.S.C. § 960(b)(1)(A). There was no plea agreement. Sentencing was held over two days. The first hearing was continued because I sought additional information.[1]

1. The Court called for information concerning the circumstances of defendant's pretrial detention—specifically, medical and mental health records from MCI–Framingham regarding the circumstances and conditions surrounding an inmate's delivery of a child while incarcerated. In addition, the Court asked for information concerning the sentencing of a third woman, Diva Monsalve, who was to pick up the drugs from Jurado–Lopez and Garcia–DeFlores. Monsalve was sentenced in the Eastern District of New York.

The Court also called for additional information on defendant's claim of coercion and duress. The government essentially argued inferences from the statements the women gave on the day they were arrested, their failure to describe the extent to which they had been coerced, and the purportedly suspicious similarity of their stories in later

months. The defendant provided a lengthy statement concerning the circumstances of her crime to probation, probation's report of an interview with a friend of the family who had taken initial custody of Alexa, as well as detailed letters from individuals in Guatemala. Specifically, I asked: "Apart from the Government's interpretation of the defendants' statements, does the government have any other information concerning the Guatemalan individuals identified in the statements, and whether such information corroborates the information provided by the defendants?" (Procedural Order, April 5, 2004.)

Finally, with respect to the claim of minimal role, I noted that the defendant bears the burden of proving both that she is "less culpable than most other persons involved in the offense of conviction and less culpable than most other persons convicted of comparable

After hearing the evidence, and digesting the letters and reports, I sentenced Jurado–Lopez to time served and released her into the custody of the immigration authorities, to be reunited with her family in Guatemala. I concluded that the only way this particular young woman would have endangered—indeed, degraded—herself by putting pellets of heroin in her rectum was if she had been coerced. No other explanation made sense. Nor did any other sentence. The idea that strictly punishing Jurado–Lopez would somehow send a message to the drug dealers that debased her, as the government suggested, seemed absurd. To the Guatemalan dealers, this woman was obviously expendable. And if I went along with the government—ignoring the grim realities of her life—I would be treating her the same way.

## I. FACTS

Although the sentencing of Jurado–Lopez took place prior to *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (casting doubt on the constitutionality of the United States Sentencing Guidelines), and my own decision in *United States v. Mueffelman*, 327 F.Supp.2d 79 (D.Mass.2004) (declaring the Guidelines unconstitutional), it has always been my practice to describe all the facts that bear on a sentence, and not simply the Guideline facts. *United States v. Iaconetti*, 59 F.Supp.2d 139 (D.Mass.1999).[2]

### A. The Arrest

On March 11, 2003, Jurado–Lopez and Garcia–DeFlores disembarked from a flight originating in Guatemala City, Guatemala. Separated from one another and questioned by customs inspectors, neither woman initially told the truth.

However, once Garcia–DeFlores consented to being x-rayed, and Jurado–Lopez was confronted with her consent form, Lopez admitted that she had "stuffed" heroin pellets into her body. When confronted with Jurado–Lopez's admission, Garcia–DeFlores also admitted that she had swallowed pellets. Both defendants stated that they were supposed to go to New York and that, upon arrival, they were to call their contact, Mirna Lau ("Lau"), in Guatemala, to tell her where they were staying.

While at the hospital, where both women were taken by customs inspectors, Jurado–Lopez passed 23 pellets, or 250.7 grams of heroin, through her rectum. Garcia–DeFlores passed 77 pellets, or 839.3 grams of heroin. A search of the women's luggage resulted in the seizure of 1,480 grams of additional heroin, secreted into the lining.

Garcia–DeFlores had the telephone number for Lau and, under the supervision of an agent, made the call. Another agent

crimes." *United States v. Martinez–Vargas*, 321 F.3d 245, 250 (1st Cir.2003). I requested information on the following: Does the defendant have information with respect to the drug conspiracy at issue in the instant case—its size, its membership, etc.? Does the defendant have the type of information possessed by persons convicted of comparable crimes? Is the "comparable crime" being a participant in a drug conspiracy, or is it, more specifically, being a courier in a drug conspiracy?"

**2.** As I noted in *Iaconetti*, "[i]n order to apply the Guidelines to the case at bar, (i.e., to interpret facts and law with respect to the quantity of drugs under U.S.S.G. § 2D1.1), the Court is obliged to look carefully at the facts that the Guidelines have made relevant, chiefly facts pertaining to the offense. But in order to determine the appropriateness of a Guideline sentence in this case (i.e., whether to depart from the Guidelines) the Court is obliged to conduct a broader review, not merely facts made relevant by the Guidelines, but all relevant sentencing facts." 59 F.Supp.2d at 139.

went to the hotel in Queens, New York, where the two couriers were supposed to stay. The agent received a phone call from Diva Monsalve ("Monsalve"), who was to make the pickup and pay the women. When Monsalve arrived, she too was arrested. Further investigation led to the seizure of one kilogram of heroin in Monsalve's apartment, and $16,400.00. Monsalve was held responsible for 3.4 kilos of narcotics, which included the drugs found in her home.

Both women, Garcia–DeFlores and Jurado–Lopez, participated in proffer sessions and provided substantially similar information—prior trips, other couriers, where they stayed, and to a limited degree, names of individuals in Guatemala. Both described their motivation for being couriers: They borrowed money from "Mauro" in Guatemala; Mirna Lau, an intermediary, insisted on immediate repayment and, when the women could not pay, told them that they could repay the debt by being couriers.[3]

The government moved for a departure for Garcia–DeFlores under U.S.S.G. § 5K1.1, but it would not do the same for Jurado–Lopez. Apparently, the only difference between the two was that Garcia–DeFlores had the name of the Guatemalan

contact in her pocket. As I describe below, I sentenced both women to time served.[4]

Monsalve, obviously seen as the most culpable of the three, was sentenced to 120 months of custody in the Eastern District of New York.[5]

### B. Circumstances Leading up to the Arrest

During a presentence interview lasting over an hour-and-a-half, defendant recounted the following:

In 1996 and 1997, defendant's parents were shot in a drive-by shooting. Her sister, Wendy, and Wendy's in-laws were politicians in Guatemala. Because Wendy frequently borrowed her father's vehicle, it is believed that the shots were intended for Wendy and Wendy's husband.

In 1998, Jurado–Lopez's husband was shot eight times and received three months of treatment for his injuries in the intensive care unit of the most expensive hospital in Guatemala. He incurred a hospital debt of $40,000. Defendant believes that this incident was also related to her husband's government ties, as he was chief of security for the city of Misco, where Wendy's in-laws were politicians. Both incidents terrified her. The perpetrators were never found.

---

**3.** The parties dispute whether defendant or her counsel shared information about the threats leveled against her in Guatemala. The AUSA involved at the proffer was not the one participating in the sentencing. The AUSA at sentencing, referring to the notes of the session, emphatically denied that anything like "duress" was mentioned. Defense counsel recounts raising the issue numerous times on that occasion and prior to sentencing. I did not have to resolve the issue. As I describe *infra*, the focus of the proffer session was not the women's defenses. It would come as no surprise if the issue were not addressed.

**4.** Notwithstanding the government's § 5K1 motion, the two women were in roughly equivalent situations. One received the benefit of a government sponsored departure, and the other was eligible for the "safety valve." *See* Part II.C.

**5.** Monsalve was on supervised release for a prior federal offense at the time she committed this crime. As a result, she was not eligible for the safety valve. Nor did she receive a role adjustment. On the contrary, Judge Charles P. Sifton found that she was a trusted member of the conspiracy, who met with other members a few days prior to her scheduled meeting with the women, and was given $16,400.00.

Jurado–Lopez and her husband had no insurance. The defendant entered into a payment plan with the hospital to cover her considerable medical debt. Although she was educated, had a business, a supportive family, and was not as destitute as many women who function as "mules," she was very vulnerable to the threats of the dealers. She fell behind in her payment schedule in January of 2002. Mirna Lau, an acquaintance, introduced her to "Mauro" for a loan. She borrowed $2,000 from Mauro to pay off the hospital. However, Mauro, to her surprise, called the loan, telling Jurado–Lopez that if she participated in his plan—taking some "clothes" into the United States—he would deduct $500.00 from the loan debt. And he made clear that even more hung in the balance— if she did not go, her family would be in danger.

But the threats did not stop after that trip. Again, Lau and Mauro told her that if she did not pay the remainder of the loan, they would go after her family. Again, defendant brought "clothes" to the United States.

In December 2002, the threats from Lau and Mauro escalated—specifically, they insinuated that they could get to Jurado–Lopez's father, since they knew his schedule in the church where he was a pastor. Jurado–Lopez agreed to a third trip; this time to extinguish the debt. The circumstances of this trip were particularly frightening.

On March 10, 2003, Lau and Mauro brought Jurado–Lopez to a hotel in Guatemala City, where Lau's boyfriend, a member of a powerful Guatemalan family, lived. At this time, she also met Garcia–DeFlores. The defendant was locked in a room, and told that she could not leave unless she swallowed the pills (which she was unable to do).[6] Next, as probation describes her account:

> The men then put a girdle on the defendant and told her to put a heroin-stuffed condom in her vagina or rectum. When the defendant hesitated, one of the men told her to put the condom in herself or he would to it for her . . . .

(Presentence Report, ¶ 17.) Lau stayed with Jurado–Lopez until the morning. She was given luggage to carry with her, and told that this was to be her last trip.[7]

Since her arrest, the defendant's family and husband have been threatened. Lau and Mauro even questioned her family about her baby, suggesting that they had sources in this country regularly reporting back to them.[8] Indeed, whatever danger she had suffered before her trip was now exacerbated because she had cooperated

---

6. Garcia–DeFlores confirms this account in her interview with probation. The government obviously credits her word enough to move for a departure on account of her "substantial assistance." In this light, the government is hard pressed to deny that both women were coerced into taking this trip. They cannot happily accept only the incriminating facts and reject the exonerating ones.

7. Garcia–DeFlores told substantially the same story—that she had borrowed $2,000.00 from Mauro after being introduced to him by Mirna Lau, that Lau tried to collect the money, and that when Garcia–DeFlores could not repay it, Lau said she could pay it back by smuggling drugs. And, like Jurado–Lopez, Garcia–DeFlores had taken two trips before. *See* n. 6, *supra*.

8. One letter sent to the Court from defendant's family in Guatemala reported that someone "has been calling [her] grandmother's house asking if . . . the baby has arrived." Her husband reported, "They want to know if you are going to keep your mouth shut . . ." There were a number of signs—including, mutilated frogs in front of the house, and instances in which family members were followed by someone reported to be a killer linked to Lau.

with the government. Even if the government did not think her cooperation was "substantial," her enemies would.

### C. *Alexa's Birth*

Defendant and her husband had been trying to have a child for eight years and had been unable to conceive.[9] She had long since given up on her chances of having a child.

She delivered Alexa while incarcerated at MCI–Framingham. The circumstances were, to say the least, difficult.[10] Immediately after Alexa's birth, Jurado Lopez went into a severe post-partum depression.[11]

## II. *GUIDELINE CALCULATION* [12]

### A. *Drug Quantity*

All parties agree that the defendant is accountable for the heroin found in her rectum, the amounts carried by her co-defendant, and the drugs found in the suitcase—a total of 2,570 grams. While, ordinarily, this amount would lead to an offense level of 32, since I also conclude that the defendant is entitled to a mitigating role adjustment, the base offense level is capped at 30. U.S.S.G. § 2D1.1(a)(3), § 3B1.2; *See also* Part II.B. An additional

adjustment for acceptance of responsibility, under § 3E1.1(a) and (b), results in a base level of 27. Another two-point "safety valve" reduction results in a base level of 25.

### B. *Role in the Offense (Minus 2)*

■■■ U.S.S.G. § 3B1.2 gives the court the authority to reduce a defendant's score if her role can be characterized as "minimal" or "minor." With respect to this factor, the defendant bears the burden of proof. *United States v. Ocasio*, 914 F.2d 330, 332–33 (1st Cir.1990). In my judgment, the defendant is precisely the person for whom the "minor" role adjustment was designed.

Defendant and probation agree that she was a minor player. The government argues against any role adjustment.

The Guidelines do not carefully define "minimal" or "minor," appropriately leaving the interpretation to the courts. The courts have carved out two referents: First, one must look to other participants in the offense of conviction. *See United States v. Martinez–Vargas*, 321 F.3d 245, 250 (1st Cir.2003). Second, one must look to whether the defendant is "less culpable than most other persons convicted of com-

---

**9.** Counsel provided the Court with an affidavit from her fertility doctors.

**10.** Probation reported (in a letter dated April 22, 2004, and sent to all parties as well as the Court) that defendant was prescribed a prenatal diet and medications, restricted to certain forms of transportation, and limited to sleeping on lower bunks only. The MCI–Framingham Health Services Administrator also noted "[o]ther typical actions taken with all pregnant women include the following: 1) allowed and advised to carry water bottles; 2) handcuffed with one hand only, instead of two hands; 3) no waist or ankle restraints; 4) placed in vans with seats, not just benches; and 5) placed in special medical vans, if required." (Probation Mem. ¶ 2.) The Adminis-

trator also noted that "when an inmate is at the hospital, she is usually handcuffed to the bed with one hand, but only when she is not in labor." *Id.*

Once an inmate mother is sentenced, she is classified and transferred to the Houston House, a program for new mothers to be with their children. Jurado–Lopez, however, was not eligible because she was not a citizen.

**11.** This was confirmed by medical authorities at MCI–Framingham.

**12.** All parties agree that the appropriate Guideline Manual is the one issued on November 1, 2002, as amended by the January 25, 2003, supplement.

parable crimes." *United States v. Martinez–Vargas,* 321 F.3d at 250.

Under the first approach, the relevant comparisons are with those involved in this case, whether indicted or not. The Court must evaluate everyone who is "criminally responsible for the commission of the offense," whether or not convicted. U.S.S.G. § 3B1.1, cmt. n. 1. Plainly, Jurado–Lopez is less culpable than Lau, Mauro, and the other individuals in Guatemala responsible for the drugs, the tickets, and the arrangements. She is also less culpable than Monsalve, who carried the money and was to pick up the drugs, and even Garcia–DeFlores, who was—so the government implied—better situated to provide "substantial assistance."

Under the second approach, comparing defendant to others convicted of comparable crimes, I draw the same conclusion. If "comparable crime" means a conviction of drug conspiracy, then, plainly, a "mule" is at the bottom of the hierarchy. Individuals willing to swallow pellets of heroin, or to insert them into their rectum, could not be any lower. These people are not just general couriers, they are body couriers. If the heroin were to leak out of the pellets, their lives could be in danger.

The government argues that I should not compare the defendant to others convicted of drug conspiracy; that I should compare her to other "mules," because otherwise there would be, in effect, an automatic "mule" reduction for role. I am not convinced that there is not such a reduction. As I noted, it is hard to imagine any person lower in the conspiracy than a "mule."

Furthermore, looking only at Jurado–Lopez and not at "mules" generally, I conclude the following: She had no role in setting up the deal, no role in negotiating the price of the drugs, and no knowledge of where the drugs were going. She did not have the name of the person to bring the drugs to; in fact, her co-defendant was the only one who had that information. She was recruited to be the container of drugs purchased, produced and packaged by others. She was selected (as I find in my duress findings below) exactly because she was vulnerable, had limited knowledge, and could compromise the operation as little as possible.

At the same time, I will not assign her a "minimal" role adjustment because of the number of trips she took, and because of the Guidelines admonition that this adjustment be used "infrequently." U.S.S.G. § 3B1.2, cmt. n. 4.

A minor role adjustment entitles the defendant to a decrease of two levels.[13]

## C. *Safety Valve (Minus Two)*

Defendant plainly qualifies for the "safety valve" under U.S.S.G. § 5C1.2, which results in another two point reduction, to level 25.

## D. *Duress*

■ Defendant also is entitled to departure pursuant to U.S.S.G. § 5K2.12 for coercion and duress.[14] The Guideline instructs that "[i]f the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the

---

**13.** Indeed, the Guidelines are woefully inadequate to deal with "role" issues of this sort. *See* The Honorable Nancy Gertner, *Women Offenders and the Sentencing Guidelines,* 14 Yale J.L. & Feminism 291 (2002).

**14.** Significantly, U.S.S.G. § 5K2.12 was not amended by the Protect Act, even though other departure grounds were narrowed by that statute. *See* Protect Act, Pub.L. No. 108–21, § 401, 117 Stat. 650 (2003).

applicable guideline range." U.S.S.G. § 5K2.12. In particular, the Sentencing Commission recognizes that "a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party" warrants downward departure. *Id.* The threats issued against Jurado–Lopez by Lau and Mauro, made particularly tangible in light of the previous life-threatening attacks against the defendant's family, surely present the appropriate circumstances for departure on the basis of coercion and duress. *See supra* Part I.B.

I credit defendant's version of the offense and the inextricably linked coercion that she experienced. None in the courtroom—except perhaps the government—would have concluded otherwise. She provided a lengthy account to probation for nearly an hour-and-a-half. Her account included an extraordinary level of detail—where her husband was, where her family was, names of individuals, times, dates, places, people. The probation officer, who perhaps has heard many more defendants than I, credited Jurado–Lopez's account.[15] The government has not disproved it. Indeed, the government had no information about what was, or was not, going on in Guatemala.

Garcia–DeFlores corroborated Jurado–Lopez's account, as did Mr. Jimenez, who took custody of Alexa. (*See* Presentence Report, ¶¶ 8, 68(a).) Mr. Jimenez gave a

telephone interview which was reproduced in the presentence report. *Id.,* at ¶ 68.

The government makes several arguments in opposition to a coercion/duress departure. First, it points to the fact that, when the defendant was first apprehended, she made no mention of coercion or duress.[16] I reject the inferences the government would have me draw. It is not at all clear to me that the failure to disclose defenses at the moment of arrest suggests anything other than a *guileless* defendant, rather than its opposite. Perhaps a tutored offender would know to raise all defenses immediately. That she was not prepared with facts in mitigation, arguably, counts in her defense.

Next, the government claims that a month and a half later, at the proffer session, defendant did not mention coercion and duress. Defense counsel disputes this. In any event, the focus of the proffer was not on her defenses, but on precisely the opposite. The government was not looking for information that would diminish her culpability. Rather, it wanted more and more incriminating facts, so that it could garner more and more evidence about other perpetrators.

The government also points to the similarities in the co-defendants' stories, suggesting that they were contrived. Yet, there is another possible conclusion—that

---

**15.** In a confidential recommendation read in open court with the Probation Officer's permission, the officer writes: "The Probation Office does not believe that the defendant would have committed the instant crime had she not been placed under coercion and duress at the hands of powerful, corrupt players in a larger scheme, who threatened physical injury and unlawful action against the defendant and her family. It is clear that an unfortunate chain of tragic events led to the defendant's situation. Her adult life has been marred by the tragedies of her parents' and husband's shootings.... After several trips of

delivering what she believed to be clothing only, the defendant was then locked in a room, placed in a girdle, and ordered to insert drugs into one of her body cavities, or the same would be forced upon her by one of the men in the room." (Confidential Recommendation, ¶ 4.)

**16.** The government initially sought to offer testimony on these interviews, but then concluded that the testimony would not add to the written record.

the gang in Guatemala was doing the same thing to all of them, that this was an operation that regularly made use of vulnerable women by lending them money and extorting their participation in drug smuggling. And, surely, Garcia–DeFlores, the government's witness, must be credited for her corroboration. The government cannot anoint Garcia–DeFlores for some purposes and not others.

Finally, the government also suggests that the violence directed at Jurado–Lopez's family—her parents, her husband—derived from other battles, namely her relatives' political positions, and is thereby irrelevant to claims of coercion in the instant case. However, I could not make a realistic evaluation of the defendant's duress without acknowledging that the previous attacks made her especially vulnerable to the dealers' subsequent threats. Since, to Jurado–Lopez, the threat of physical injury to her loved ones was far from an abstraction, her actions seem "reasonable" and "proportional" to the coercion that she experienced. *See* U.S.S.G. § 5K2.12. Accordingly, a downward departure is consistent with the mandates of § 5K2.12.

### III. CONCLUSION

I sentenced the defendant to time served, which effectively meant her immediate deportation. This sentence amounts to a departure from a level 25 to a level 13. While the extent is substantial, no other request adequately addresses what she had been through. No other outcome is, in a word, fair.[17]

**SO ORDERED.**

---

17. I am obliged to reject defendant's departure motion based on family obligations and extraordinary acceptance of responsibility. With respect to the former, the case law is, in a word, cruel. It does not recognize the pain a mother feels for her newborn. The fact that a child has another caregiver (in this case, the defendant's husband) is all that matters.